**HAAS DRILLING COMPANY, Inc.,**
Petitioner,

v.

**FIRST NATIONAL BANK IN DALLAS,**
Respondent.

No. B–1857.

Supreme Court of Texas.

July 8, 1970.

Rehearing Denied July 29, 1970.

Wood, Boykin & Wolter, Marshall Boykin, III, Corpus Christi, Rain, Harrell & Emery, Morris Harrell, Dallas, for petitioner.

Coke & Coke, J. Edwin Fleming, and Ernest E. Figari, Jr., Dallas, for respondent.

McGEE, Justice.

Haas Drilling Company filed this action against First National Bank in Dallas, based upon an alleged oral promise by the Bank, acting through its officer, to assume as its own debt and pay the note and account of another, B & B Gas Petroleum, Inc. The Bank filed an answer containing a general denial, special denials and the Statute of Frauds. Based upon a jury verdict the trial court rendered judgment for Haas. The court of civil appeals reversed the trial court's judgment and remanded the cause on the grounds that Special Issue No. 1 was multifarious, that the accompanying instruction was defective, and that the definition of consideration in the court's charge in connection with Special Issue No. 2 was erroneous. 446 S.W.2d 29. We granted the application of Haas on its point that Special Issue No. 1 was not multifarious. The Bank also filed its application for writ of error contending that the court of civil appeals should have rendered judgment in its favor because Haas failed to prove and obtain necessary jury findings in support of the "main purpose doctrine" in order to take the Bank's oral promise out of the Statute of Frauds. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

The evidence is related in detail in the court of civil appeals opinion and it would unduly lengthen this opinion to relate all of it here. We will summarize the evidence as it may be pertinent here. Haas commenced selling jetting gas to B & B for the Cantu Lease in 1964. B & B was slow in paying its account. In July, 1964, the Bank made a $250,000 loan to B & B secured by a mortgage on various oil leases owned by B & B, including the Cantu Lease. Thereafter B & B executed and delivered a note to Haas for jetting gas furnished to the Cantu Lease through September, 1965; an additional amount became due on account for gas furnished during the months of September, October, November and December of 1965; the total of these two items was slightly in excess of $7,500. The amount is not in dispute.

In about August, 1965 production of the Cantu Lease decreased drastically and B & B became in default on its payments to the Bank. In January, 1966, the Bank assumed the operation of the mortgaged leases, including the Cantu Lease. On several occasions Haas notified the Bank that it wanted the B & B note and account paid in full, otherwise it would refuse to continue providing jetting gas. These conversations antedated the alleged promise made the basis of this suit, and are set forth in detail in the court of civil appeals opinion.

On March 1, 1966, Mr. Meredith, a bank official, and Mr. Beason conducted a foreclosure sale. After the foreclosure sale, and on that same day, Mr. Haas in substance testified that he told Mr. Meredith that he was interested in collecting his money, and reminded Meredith that he had said he would "straighten this out when he came here today." Mr. Haas said he needed his money and that he was looking to Meredith to get his money, and Meredith said "he would be responsible for getting my money to me and he would like for me to continue giving them gas until they could sell the property in order to not let the well sand up and keep producing." He also said, "I talked at considerable length that there would be no mistake about it; if I left the gas on, I would get my money and he agreed. He would get my money, and he asked that I leave it on because he said, 'If you cut it off, I can't sell the property and therefore all of us lose,' and he wanted to have an opportunity to get the production going and sell the properties for more than what he bid at the courthouse steps, and so after much consideration, I agreed again, thinking that it was the Bank and I could take their word for it. * * * He said that he thought he could sell the property in a month or two and that he would definitely have my money by that time." Meredith denied that he agreed that the Bank would pay the B & B debt; he testified in effect that if the Bank sold the properties for an amount in excess of B & B's debt, he felt that the Bank committee would look favor-

ably upon paying Haas. After foreclosure the Bank spent several thousand dollars in an effort to improve production and then sold the leases. After Haas' attempt to collect from the Bank, this suit was instituted.

The trial court's charge contained four special issues; the last two issues inquiring of actual and apparent authority of Meredith to represent the Bank are not questioned on appeal.

"SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that on or about March 1, 1966, the Defendant, First National Bank in Dallas, by and through its vice-president, H. M. Meredith, agreed to assume payment as its own debt the indebtedness then owing to Haas Drilling Co., Inc. by B & B Gas and Petroleum, Inc.?

Answer 'Yes' or 'no.'

Answer: Yes.

You are instructed that by a person who agrees to assume payment of the debt of another as its own debt is meant a person who intends to accept primary responsibility for payment of such debt, which intention is determined by taking into account all of the facts and circumstances surrounding the transactions between the parties including the words used by the person in making the promise, if any.

SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that the agreement of First National Bank in Dallas, if any, to assume payment as its own debt the indebtedness owing on or about March 1, 1966, by B & B Gas & Petroleum, Inc. to Haas Drilling Co., Inc. was made in consideration of the promise by Haas Drilling Co., Inc. to continue to furnish jetting gas to the Cantu Lease?

Answer 'Yes' or 'no.'

Answer: Yes.

You are instructed that consideration as that term is used in this charge, means a direct benefit, that is, a benefit which subserves some purpose of the party making the alleged promise. Consideration is that thing of value offered by one party to another in return for some thing of value. It may consist of a promise given by one party to another to do or refrain from doing something in return for the other party's promise to do or refrain from doing something."

We shall first discuss the application by Haas. Haas contends that the court of civil appeals erred in its reversal of the trial court's judgment and holding that Special Issue No. 1 was multifarious and that the accompanying instruction was defective. We sustain both of these points.

■ We think that Special Issue No. 1 was not too broad, because more latitude is permitted in the wording of special issues in cases other than negligence cases. All of the cases relied upon in the court of civil appeals are negligence cases.

In his 1969 Supplement on Special Issue Submission in Texas, Hodges notes the distinction in special issue submission in negligence and non-negligence cases; at page 71, he states: "Since Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (1953), it is quite clear that there will be no reversal in non-negligence cases simply because the issue is too broad or too small. The trial court has almost complete discretion, so long as the issue in question is unambiguous and confines the jury to the pleading and the evidence." In fact, the opinion in *Roosth & Genecov Production Co.* (a negligence case) said: "We hold it was reversible error to submit the issues in question in the form used and that on the next trial separate issues should be submitted for each item of defectiveness alleged and proved. *At the same time we do not consider that we are overruling City of Houston v. Lurie* [148 Tex. 391, 224 S.W.2d 871 (1949)] *or How-*ell v. Howell [147 Tex. 14, 210 S.W.2d 978 (1948)] *or even limiting their effect in cases other than those of negligence to which they might be applicable.*" It might be noted that all limitation issues submitted in trespass to try title cases are multifarious.

■ The Court of Civil Appeals also held that the instruction given by the trial court in connection with Special Issue No. 1 was defective in that it did not go far enough; that it should have instructed the jury that to accept primary responsibility for the payment of the debt of another the promisor must *unconditionally agree* to be responsible for such debt. We disagree. We interpret the instruction to impose an unconditional promise to be primarily responsible for the debt of another. Our Court in Gulf Liquid Fertilizer v. Titus, 163 Tex. 260, 354 S.W.2d 378, 384 (1962) said: "Unless reasonable minds could not differ as to the interest of the promisor to be a surety or not, the precise words or form used are not controlling. * * * If the words used are not clear and are susceptible of more than one meaning, the question of intent to be *primarily responsible* for another's debt is one for the finder of fact, taking into account all the facts and circumstances of the case, including the words used by the promisor." The trial court instructed the jury that a person agrees to assume payment of the debt of another as his own debt when the person intends to accept "primary responsibility for the payment of such debt." This terminology is, in our opinion, clear enough without the further explanation that the term "primary responsibility" itself means unconditional agreement. Gulf Liquid Fertilizer Co. v. Titus, supra, 382.

The Bank's application for writ of error urges that the court of civil appeals should have rendered judgment in its favor because Haas failed to obtain essential jury findings under the main purpose doctrine, thus leaving the oral promise within the

terms of the Statute of Frauds,[1] and the error of the trial court in refusing to grant Bank's motion for judgment non obstante veredicto and for instructed verdict on the same grounds. The Bank contends that Haas has wholly failed to request issues as to (1) whether a benefit directly accrued to the Bank and (2) whether such benefit was the main purpose of the Bank in making the alleged promise, each of which is essential to a proper submission of the case.

■ In Texas the main purpose doctrine is applicable to take an oral promise to pay the debt of another out of the Statute of Frauds. In Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378, 382 (1962), this Court said:

"In determining whether a promise to pay the debt of another is within or without the Statute of Frauds, one test devised by the courts is whether the promisor, by his promise, is a *surety* and is therefore secondarily liable, or whether he has accepted *primary responsibility* for the debt of another. By this test if an oral promise creates the relationship of surety and principal between the promisor and the original debtor, and if the fact is known to the creditor-promisee, it is within the Statute and is therefore unenforceable. An oral promise creating *primary responsibility* in the promisor to the creditor-promisee is without the Statute and is therefore enforceable."

In the Titus case, this Court observed "that most cases have turned upon two or more of the following inquiries which are made to determine whether an oral promise to pay the debt of another is without the Statute and enforceable. * * *

1. Did the promisor intend to create primary responsibility in himself to pay the debt, or did he intend merely to be a surety

\* \* \* \* \* \*

2. Was there consideration for the promise? This inquiry is the same that would be made for any other promise, oral or written. Sufficient consideration is necessary to create a binding contract, generally speaking.

3. Is the consideration given for the promise the sort of consideration which the courts say is necessary to take the promise out of the Statute * * *. This rule ["main purpose" or "leading object"] places the promise without the Statute, and therefore enforceable, if the consideration given for the promise is primarily for the promisor's own use and benefit."

As noted above, we have concluded that Special Issue No. 1 and the jury's answer thereto affirmatively answers inquiry No. 1 set forth in the *Titus* case, supra. The Bank did intend to create primary responsibility in itself to pay the debt of B & B as its own.

We are of the opinion that Special Issue No. 2 and the jury's answer thereto affirmatively answers inquiry No. 2 set forth in the *Titus* opinion, supra.

The undisputed evidence establishes, as a matter of law, that (a) a benefit did flow to the Bank, and (b) that such benefit was the main purpose of the Bank in making the promise. (Inquiry No. 3 set forth in the *Titus* opinion, supra).

■■ The main purpose of the Bank in assuming primary responsibility for the debt of B & B to Haas on or about March 1, 1966, was to protect the value of the property which it had bought in at the

---

I. The Statute of Frauds, Art. 3995, Vernon's Ann.Tex.Rev.Civ.St., provides in part:

"No action shall be brought in any court in any of the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereunto lawfully authorized:

"* * * *

"2. To charge any person upon a promise to answer for the debt * * * of another; * * *."

foreclosure sale. At that time the Bank had foreclosed; thereafter, B & B had lost all interest in the Cantu Lease. The Bank, as promisor, received the promise and actual furnishing of jetting gas to the Cantu Lease. A shut down of jetting gas operation would have probably caused the wells to sand up, with the loss of production or at least an expensive reworking operation. The availability of jetting gas would be a factor affecting the resale value of the Cantu Lease. This benefit, at the time it accrued, could only flow to the Bank. B & B had lost its title through foreclosure.

When the promisor assumes primary responsibility and his leading object is to serve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, the oral promise is not within the Statute of Frauds. Gulf Liquid Fertilizer Co. v. Titus, supra; Cooper Petroleum Co. v. La Gloria Oil & Gas Co., 436 S.W.2d 889 (Tex.Sup.1969). Both cases cite Corbin on Contracts, 1950 ed., Sec. 367: "The *promisor* is not in the least benefited by the performance of his own promise. In order to take his promise out of the statute, he must be bargaining for a consideration that is beneficial to himself and that constitutes his primary object or desire."

The *La Gloria* opinion, supra, points out (p. 896) that in applying the main purpose doctrine then, we must look to the consideration that was received for the promise and determine (a) whether the promisor obtained, as part of that consideration, a benefit accruing directly to him personally; and (b) if so, whether the obtaining of that benefit was his main purpose for making the promise. We hold that both of these requirements have, as a matter of law, been proved by Haas in this case.

 The Bank objected to the definition of "consideration" which was given in connection with Special Issue No. 2, stating, "In this regard, defendant would suggest and hereby requests the following explanation of 'consideration': 'You are in-structed that consideration, as that term is used in this charge, means a direct benefit which subserves some purpose of the party making the alleged promise.' " We note that the trial court did incorporate the substance of this instruction in the definition submitted. We find no error in this procedure.

Judgment of the court of civil appeals is reversed, and judgment of the trial court is affirmed.